The next case this morning is 524-1200, People v. Boyd. Arguing for the appellant is Matthew Krevelik. Arguing for the appealee is John Barrett. Each side will have 10 minutes for their argument. The appellant will also have 5 minutes for rebuttal. Please note only the clerk of the court is permitted to record these proceedings today. Morning. Good morning, your honor. We went a little over on the last case, so we apologize for keeping you waiting on this one. Feel free to try and catch us back up to our schedule. So, is it Krevelik? You nailed it, your honor. I was a little surprised, but one of the first times ever. So, yes, thank you. You're welcome. All right. If you're prepared to begin, you may do so. Thank you. May it please the court. Counsel, I'm Matthew Krevelik with the Office of State Appellate Defender, and I represent Jamie Boyd. This case is about a sentencing modification scheme designed to offer survivors of domestic abuse and postpartum illnesses the chance for a lower sentence. Here, Jamie Boyd has earned her chance. She sought relief through both subsections B5 and B10, attaching medical records that showed she suffered from lifelong domestic abuse and mental health conditions that track the statute's definition of the postpartum illnesses. Further, these records show that she suffered from these conditions just months before the offense here. And at this point, in this stage in the proceedings, she's done enough to survive the state's motion to dismiss. And despite the state's constitutional complaints, the people of Illinois have spoken, and they said this, let these survivors have their chance to plead their case, even those who pleaded guilty. So, we asked this court to reverse the circuit court's dismissal and remand for further two 1401 proceedings. And now, a brief overview of the arguments, since there's a lot of moving parts. I plan to start discussion today talking about the clarification of the retroactivity doctrines. Then I'll discuss how her pleadings were sufficient and not procedurally barred. And then if time permits, I will address the state's constitutional arguments. So, first, the clarification of retroactivity doctrine. It helps to keep in mind the state's core complaint here. The state says the core problem is that the circuit court dismissed this petition two months before this new 2025 amendment became effective. But for two independent reasons, Jamie can still benefit from these statutes, even though she entered the negotiated plea, and it was dismissed two months before this 2025 amendment became effective. So, first, the simplest and most straightforward is the Supreme Court's traditional retroactivity approach. This new amendment in 2025 was a procedural rule change. It offered a procedural mechanism for people negotiated pleas to obtain relief. And since it was a new procedural rule, it applies to all cases that were still ongoing and pending when the rule became effective. That's the case here. Jamie's petition and her case was pending in this court when the new law became effective, and there are further proceedings to apply this rule on a remand. So, this court's traditional retroactivity approach, this court can apply the law as written and still remand for further proceedings under this new 2025 law. Second, under the clarification doctrine, and this is the steward approach. So, the 2025 amendment clarified that the law in effect in 2024, when she filed the petition and when it was dismissed, was intended to extend to negotiated pleas. Now, as Wells recognized, an earlier pre-2024 statute, there was ambiguity and silence about whether the statutes were intended to reach people who entered plea agreements. The majority found that the silence meant that they didn't extend to people under plea agreement. While the dissent, Chief Justice Neville believed that these subsections did extend to those due to those petitioners. And when we look to the legislative history in the 2025 amendment, Representative Kelly Cassidy said, we took this ambiguity identified in Wells and we're responding to it. They wanted us to use more clear language to show that the law was intended to extend to people who entered negotiated pleas. And that's exactly what they did with the 2025 amendment. Now, this also tracks not only how does that sit though with the fact that during a negotiated plea, both parties are sitting down at the table and conceding, giving up some right that they might have to go forward with at trial. And by agreeing to the negotiated plea, it's sort of a contractual situation where they've agreed to give up certain rights. How does that sit with this? So there's a couple of aspects with that. So for the contract giving up the rights, the legislators recognize that these survivors of domestic abuse and postpartum illnesses may not be aware at the time that they enter the plea agreement, at the time they committed the offense or even the time of trial, the effects from these two different illnesses have on them. There's not an adequate opportunity for them to have counseling and discover the ramifications and the impact from suffering from these two, I'll call them illnesses right now, just for ease. And so that's exactly why in 2024 after Wells, the legislator amended these statutes to take them out of this two-year requirement. Because there's an understanding from the legislator that these victims are not aware of the impact at the time that they plead guilty. And second for giving up the contractual rights here, this is a part that the state misses in their brief. The people who benefit from this plea agreement is the people of Illinois. It's the Illinois taxpayers. They're the ones who benefiting without having to go to the expenses through trial. And they're the ones who through the legislator decided to enact this sentencing reform belief. It would cut down costs and save budgets. And these overly harsh sentences to people who have been survivors of domestic abuse and postpartum illnesses breeds a disrespect for the law. For punishing people who have been abuse victims and only participate in offense because they're struggling with these conditions, they're not worthy and they don't an overly harsh sentence. So there is no actual contract dispute or contract problem between this new modification scheme. So isn't it true though that at the time of the negotiated plea, the defendant here knew of the history, her own history with regard to domestic abuse and so forth and so on that could have been raised, could have been considered. At this point, the state, if it's not raised, the state doesn't know that and can't address that in any way on the people's behalf. And after they've made this negotiated agreement and then this kind of information is allowed in without a motion to vacate the negotiated plea or not to vacate, but to start new, if you will, the state can't really address it at all. Yes. That also brings into an overall, like a broader view of what this is meant. At the time that Jamie pled guilty, these two subsections and these modification schemes were about two decades away from being enacted. They weren't even sentencing guideline factors or mitigating factors for another 16 years. So even if Jamie did know that she was the victim of domestic abuse and did have these postpartum illnesses, there was no legal mechanism for her to bring these or for a court or even the state's attorney to consider that when enacting this agreement. That's kind of a theme that reverberates throughout the state's entire brief and argument here. The state argues that she should have brought this earlier or that she did bring these claims earlier. But the legal mechanism for Jamie as either a domestic abuse survivor or for these postpartum illnesses to bring these claims to mitigate her sentence was not enacted until recently. It just didn't have a possibility to bring them up. Going forward, there are now instances for Jamie and people who have pled in the past should have more opportunity to bring those up at the present time because there are sentencing factors now that reflect it. But the reality of the situation is that there's a lot of people who are currently in prison who had no opportunity to legally bring these claims before now. That's exactly what the legislative history for both of these amendments reflects. The 2024 amendment. There, the legislator and representative Kelly Cassidy again said there's overwhelming people who've entered these agreements, these plea agreements, without the opportunity to discuss the impacts of these illnesses on their actions. We want them an opportunity and want more people to benefit from these schemes because it's important. That's why they took away the two-year time for people to get the counseling they need while in custody and to recognize the ramifications and even the gap of the evidence. Because for example, Jamie, considering her personal circumstances, she had significant intellectual disabilities. She reads and writes at a second grade level. Our understanding of domestic abuse and postpartum illnesses has evolved greatly in the last 20 years. Jamie, and in all fairness, it's going to take time for her to recognize that she was the victim, how these two illnesses affected her, and she worked diligently to get these records and bring these claims. Because essentially, at the same time the state's saying that, oh, she should have brought this beforehand. It's saying that she still can't benefit from this scheme because the court brought her petition too early. The legislator understands that we have to have a mechanism for these people who did not have a chance previously to bring up these mitigating factors to do so here. I see my 10 minutes is expiring. Thank you, your honors. I'll save the rest for rebuttal. Time flies when you're having a good time, right? You will have time in rebuttal. But before we move on, Justice Vaughn, Justice Clark, any questions at this time? No, thank you. I do briefly. The Wells decision by the Supreme Court touched on fully negotiated pleas, and then these amendments came out, but they didn't address specifically fully negotiated pleas. They just said plea agreements. Does that play any part in our decision in this case, that this was a fully negotiated plea? No. The legislative history over and over again shows exactly that the legislator wants to extend it to people who entered fully negotiated pleas. Again- But they didn't say fully negotiated. They just said negotiated pleas. I think the Wells decision somewhere in my reading talked about four different types of negotiated pleas, one of them being fully negotiated where the sentence is totally agreed to, and then you contract law under Wells. So the legislative amendments did not discuss fully negotiated, if that makes a difference. I guess that's what I'm asking. So it does not matter for the fully negotiated or partially negotiated pleas. I'm familiar with the case that you are referring to, discussing the different types of plea agreements. Wells was addressing, she entered a fully negotiated plea. And Representative Cassidy, again, when they enacted this 2025 one, specifically said, was commented on Wells. They said, this was what Wells says. And we want to give the people in that situation the chance to bring their claims and give them that procedural recognizance. So there was no distinction for the legislator between fully negotiated pleas or partially negotiated pleas. Thank you. Mr. Clark, any questions? No, thank you. Okay. I know I keep asking you that, but every time we ask a question, it might raise another question for us. All right. You'll have time in rebuttal. Mr. Barrett, if you're prepared, you may begin. Good morning, your honors. Can you hear me okay? Yes. All right. And counsel, and may it please the court. John Barrett, representing the people of the state of Illinois. Your honors, the briefing in this case presents significant constitutional questions regarding the separation of powers, the contracts clause, and the limits of legislative retroactivity. The people stand firmly behind the constitutional arguments we advanced in our brief. However, this case has a well-established duty, or this court has a well-established duty to resolve cases on non-constitutional grounds whenever possible. You do not need to reach those constitutional questions today because the plain language of the statute and the four corners of the petition compel this court to affirm on much more fundamental grounds. As a threshold matter, the relief defendant seeks is statutorily barred for her concealment of a homicidal death. Subsections B-5 and B-10 apply exclusively to forcible felonies. Because concealment of a homicidal death is not a forcible felony, that consecutive five-year sentence is categorically ineligible for modification. As to her murder conviction, defendant's petition fails to assert well-pled facts establishing the strict causal requirements of either subsection. While her history of childhood abuse may meet the broad statutory definition of domestic violence, she completely failed to plead any facts showing how her her participation in a premeditated murder decades later was related to that child abuse. Furthermore, she failed to plead how this murder was the direct result of postpartum depression, a condition her own medical records affirmatively state she never had. We ask this court to affirm the circuit court's dismissal based on three overarching points. First, defendant's petition is statutorily barred and factually insufficient. It fails the forcible felony requirement for the concealment charge, and it fails the distinct causation requirements for the murder charge, and her claims are affirmatively rebutted by her own medical exhibit submitted in the petition. Second, under the binding precedent of People v. Wells, she is categorically barred from this relief because she entered a fully negotiated plea and the 2025 statutory amendment operates prospectively only. Third, her claims are independently barred by race judicata, and her attempts to use new evidence to bypass that bar actually undermines her own case. I will start with a threshold issue. The total lack of well-pled facts regarding causation. Under subsection B-10, the defendant must plead that this brutal murder was the direct result of a postpartum condition. Her timeline makes this mathematically and medically impossible. Defendant's baby was born in January of 2000. The murder occurred more than 14 months later. When we look at her mental health evaluation from November 2000, when her baby was nine months old, the clinicians explicitly noted that the birth of her child, there was no diagnosis of postpartum depression at that time. This is critical, your honors, because in 1994, the DSM-IV officially introduced the specifier for major depressive disorder with postpartum onset. When these doctors evaluated her in the year 2000, that diagnosis existed. The doctors knew her child's age, they knew defendant presented with mental health challenges, and they actively diagnosed her with a severe personality disorder, not a postpartum disorder. Furthermore, any attempt to claim this murder was the direct result of a postpartum condition is shattered by her own mental health records at C-1158. Those 2000 records show she already had a documented history of homicidal ideation. She had considered killing people in the past, threatened a man with a knife, and hit an ex with a bat. That pre-existing homicidal ideation is in no way tied to any postpartum condition. And if there's any lingering doubt, we look at the 2022 Illinois Department of Corrections Psychological Evaluation, which explicitly states the defendant has no history of postpartum depression. That is a very recent, within the past few years, evaluation that went through her history, reviewed her history, and excluded the history of postpartum depression. That was submitted in defendant's exhibits on page C-1148. Turning to subsection B-5, her claims under subsection B-5 for domestic violence fail on the exact same lack of causation. The statute requires her to plead that her participation in the murder was related to her prior child abuse. Defendant's tragic history of childhood abuse brings her under the broad statutory definition of a domestic abuse. The 2022 Illinois Department of Corrections Evaluation at C-1147 does note a history of abuse. However, that exact same page also notes that she has no history of domestic violence in her adult life. More importantly, defendant pleads absolutely no facts establishing a causal nexus between childhood abuse and her active participation in a premeditated coordinated murder plot decades later. A speculative leap bridging decades is not a well-pled fact. Her participation in this murder is not related to her childhood abuse. As the records establish, her actions are the result of her long-documented severe personality pathology and pre-existing homicidal ideation. This court is reviewing de novo, so it's not required to accept conclusory allegations of causation that are affirmatively rebutted by the exhibits attached to this petition. Your honors may affirm the dismissal for any reason appearing in the record, including those discussed this morning. Now, turning to the retroactivity issue. So, even if we look past these factual deficiencies, the dismissal must still be affirmed under people view wells. At the time the circuit court ruled, wells definitively held that the plain language of the statute excluded defendants who entered fully negotiated pleas. The circuit court was bound by wells and did not err by applying binding Illinois Supreme Court precedent. Defendant attempts to bypass wells by arguing the 2025 amendment applies retroactively, and to get there, she relies on people v. Hunter to claim her case is currently pending. Your honors, this is a severe misrepresentation of Hunter. In her brief, she quotes Hunter but ignores the phrase on direct review. This case is not on direct review. Her criminal conviction became a final judgment 22 years ago. Under well settled law, a section 2-1401 petition is an independent collateral civil action. Filing a civil lawsuit in 2024 does not magically reopen a 2002 criminal conviction and render it pending. If all an inmate had to do to make their case was drop a civil petition in the mail, then the concept of finality in this state is dead. But even if we look beyond the pending fiction, the Illinois Supreme Court's recent decision and people v. Brown completely forecloses any retroactivity argument under the statute on statutes. I'm just checking my time here. I want to make sure I'm okay. All right. Brown unequivocally holds that when the legislature utilizes a delayed effective date, it is a definitive expression of legislative intent that the statute is to apply prospectively only. Here, the legislature passed Public Act 103-968 but explicitly delayed its effective date to January 1st, 2025. Under Brown, the delayed effective date is dispositive. It definitively signals that the legislature did not intend to retroactively reach back and unravel decades-old final criminal judgments. Because the legislature's prospective intent is clear, the statute on statutes analysis stops right there. Moving to the race judicata and the new evidence fallacy. In a reply brief, opposing counsel correctly notes an attribution error in the people's brief regarding the March the court for conflating those citations with the post-conviction petition in 2015 that was filed versus the motion to reduce sentence. But that does not change the substantive reality of this record. Defendant argues her claims are not barred by race judicata because she has never brought these exact statutory claims before. But race judicata operates on operative facts, not statutory labels. The record irrefutably shows she has serially litigated her mental illness and her medication status, including in her 2005 petition and the 2020 motion, which explicitly raised postpartum depression. To escape this, she relies on People v. Tyler arguing that her 2022 and 2023 medical evaluations constitute new evidence. But that's fatally flawed because when we look at those records, those records affirmatively indicate at the citations that I pointed out to your honors that she has no history of postpartum illness or postpartum depression. None. She has a personality disorder, but no documented mood disorder. And then in her reply brief, defendant also attempts to rebrand this 2-1401 petition as a simple matter of sentencing reform. It's not. Sentencing reform relates to how a trial court must evaluate mitigating and aggravating factors at an original sentencing hearing. What defendant is referring to here is not sentencing reform, but the use of a civil and sentence secured over two decades ago. That directly violates the bedrock principle recognized in People v. Wells. In a fully negotiated guilty plea, the conviction and the sentence are a packaged deal. They're inseparable. Defendant is asking this court for a judicial scalpel to cut away the 40-year sentence that she dislikes while happily keeping the benefit of the dismissed aggravated robbery conviction. Wells explicitly forbids this. Now, as to the effective date going forward, negotiated pleas, you know, they put it on the table, these two conditions. And if there are any parties to these agreements and contracts coming together now, the state's attorney and the defendants are on a much better footing given this effective date going forward to put those facts and evidence before the court and to have that considered in coming to a plea arrangement. And, you know, going forward, certainly parties could challenge their sentences if those facts were undermined in any way or were not considered during the plea this, you know, from January 1st of 2025 going forward. That would make a lot of sense. But to reach back two decades after defendant has already raised mental health concerns in the past and then puts before this court records that affirmatively show that she never had a history of postpartum depression, this isn't that defendant. You know, it's not a proper request. So I'm sorry. It looks like I've run out of time. And I would ask that your honors affirm if there's not any questions. I do have a couple of questions. First, in terms of the timeline here, what date did the court dismiss this defendant's petition for, you know, sentence modification in relation to the effective date of the amendments that we're talking about? Uh, I believe it was in November of 2024. So it was dismissed in November of 2024. And the effective date of the amendment was January 1st of 2025. Okay. So effectively not, it was not pending at the time that the effective date of the model or this, these amendments took place? It was not. Okay. And then one other question for you, and you, you point out in your brief that there were some problems with the, with the appellant's brief. Can you point to what you're referring to specifically? In other words, the statement of facts were argumentative or so forth and so on. Your honor, if you can't drop the top of your head, that's fine. Generally speaking, you know, not putting before this court that, you know, or, or, or indicating to this court that the medical records that were uh, uh, submitted as exhibits did, uh, actually affirmatively show that she never suffered from postpartum depression. These are conclusory allegations. So on their face, uh, I don't believe maybe I don't know if I mentioned that specifically in the statement of facts or my criticism of the statement of facts, but the mental health history itself wasn't given, uh, wasn't given full, uh, acknowledgement. And so I wanted to flesh out some details just regarding certain, certain aspects of, of her mental illness that were raised in the 2005, uh, post conviction. And then, um, certainly in the 2020, uh, uh, petition that she raised postpartum depression and, and, uh, domestic violence. So, um, there were several, there were several submissions that were, you know, not, not as forthright as, as they should have been. Okay. And then I fully acknowledged that I had misquoted or miss it, misattributed, uh, certain facts in my own brief where we deal with a lot. We, we marshal a lot of, a lot of facts forward in these cases. So it's easy to do. Okay. Um, justice Vaughn, justice Clark, any questions? No, thank you. One question, hopefully briefly, the, uh, you seem to be saying that the Wells case is controlling because it discusses negotiate fully negotiated pleas. And this was a fully negotiated plea, but if the Wells case is controlling, how do we address or consider the legislative history and legislative intent that opposing council talks about? And I think I may be misstate in the name, but legislator Kelly seemed to be saying these amendments are to address Wells. If that's the case, how do we address that? Yes, your honor. And that's not problematic because, uh, the Illinois Supreme court spoke to the core foundation of, uh, fully negotiated pleas within the Wells case. And that was established in people be Evans that, uh, in a, in a fully negotiated plea, the, the, uh, conviction in the sentence are inseparable. So that, that is a fundamental, uh, that is a fundamental rule of law that's embedded, um, from the Supreme court. And, uh, so during the, during the Wells case, when it spoke to that, the, it interpreted the statute is consistent with the law at the time. Well, I guess my question is this, if the Wells case talks about fully negotiated, please, and they come up with these amendments to address the Wells case, but they don't put in this new amendments, the phrase fully negotiated, please do we even look to legislative intent? Or if we do, how much weight do we give that? We can't give it. We can't give it much weight because the statute was ambiguous on it at worst. And, um, going forward, even looking at the legislative history, the legislature can't clarify what the Illinois Supreme court has spoken to directly and said, this is the law. So they can certainly amend the statute in a clear way from say January 1st of 2025 going forward to include, you know, a specific subset of domestic violence and postpartum depression survivors. But, uh, you know, at the time as the law student was interpreted was controlling. Thank you for the questions. Okay. Uh, thank you, uh, Mr. Barrett for your arguments, um, Mr. Kralovec. Yes. Thank you, your honor. So first there's a couple of major points I want to hit on, uh, the, so the state's complaint about this forcible felony for the concealment of a homicide. They didn't bring that up below. They didn't bring it up in this brief here. This is the first time they're bringing it up on this argument up over here. So I asked this court to just discard that, uh, from the get go. Secondly, the state's overall argument here seems to be guessing the factual merits of Jamie's petition and whether these records does show that she had domestic abuse or this postpartum illnesses. And that is exactly why they should have survived a motion to dismiss the fact that they're getting into all these specific claims about whether it showed she related or whether she was really suffering. It shows that a factual dispute does exist. And particularly the state is trying to claim that the records show affirmatively, she did not suffer from post, uh, postpartum illnesses, and that is just flat wrong. And none of the records is she being evaluated for any postpartum illnesses. There's a difference. I mean, I'm reluctant to interrupt you during rebuttal, but is there a requirement that you have a medical diagnosis of postpartum? If you facts that meet the clinical definition, do you have to have a diagnosis? No, you do not require. Yes, your honor. There is no requirement that you have to have a medical diagnosis. And in fact, this has kind of shown a little bit in people be McLaren, right? Um, the statute itself, right. For all the symptoms do not are not explicit. They're examples of the type of symptoms and conditions that people with these illnesses are suffering from. And you do not need a medical diagnosis before you can obtain relief. Sure. If they want to advance this over to more factual dispute, right? Another, uh, hearing on it, right. To drive the motion dismissed, we present witnesses to see if she really does suffer from these illnesses. That's the place to do it, but not on these pleadings and not also on appeal. Cause another important fact here is the state did bring a two six 15 and a two six 19 in those motions. If the state wanted to test that the facts pled in these or in the medical records did not establish any of the elements are these subsections. That was the time to do it. The state never argued any of those in its motion to dismiss. Instead, the state relied only on the fact that she entered a negotiated plea. It said nothing about how her claims in a petition did not meet either domestic abuse or the postpartum illnesses. It said nothing about whether her petition insufficiently showed any of the five requirements from each subsection. So again, that argument, uh, was not considered below here. And it's another further proof that this is a factual dispute that should have survived this motion dismissed because you're right. How do you respond to opposing counsel cited as to the record in 1158 and 1147 saying she had preexisting homicidal ideations prior to postpartum and the DOC reports show no history of domestic abuse in her adult life. So these allegations aren't really sufficient to meet the amendments that were laid out. Yes. So two very brief ones, um, about that, the, his claim about, uh, they're showing no domestic abuse in the adult life. What he's referring to is one check box in a medical form, right? It's not like a questionnaire or they're asking her, are you suffering from these? Are you not professional? Uh, going through a checklist of boxes, all the other records, if you look at them in total and as this court at this stage, they must liberally construe all the medical records in the light, most favorable to Jamie shows that she was suffering from domestic abuse and these postpartum illnesses for a long time. While there is one, that record that had at least one box on check the overwhelming medical records show that she does and has been telling saying that reported domestic abuse, even the constraints around a claim right now that the childhood domestic abuse could not have contributed to this offense. If you look at the, some of the medical records, she was hitting the head twice with a medical pipe, right? That's a domestic abuse. It could have ramifications that last longer than years. It could lead to, uh, in her latest one, they want her to get tested to see if she's got an undiagnosed traumatic brain injury from those hits to the head that can have lasting impacts that last throughout her entire life. But above all, the most important point about this right now is that these are factual disputes that we got to take further to a factual hearing. We can go back and forth right now about all these medical records and whether or not they're sufficient, but this was not the proper stage to dismiss for those reasons. And they weren't even reasons that the state brought up below. And finally, because I do know as my time is running out, uh, the state about its contract claim again, uh, in claiming that this is a different procedure. Um, there's two important things. So for Hunter and Brown, right? Those cases weren't pending because the amendments, right? Were about the underlying criminal proceedings. If you remember a lot of them deal with the JCA and the timing of age that you first have to be convicted before you get either class X sentencing or a natural life sentence, those criminal proceedings had ended, right? So he can't benefit. There were no ongoing proceedings to remand the case to this is different here because the amendment at issue is about the PRJ statute, right? And those proceedings are still pending. And example, as I say, pointed out, the, uh, petition got dismissed in November. At the same time though, uh, Jamie had requested, uh, to file a response to the state's motion and also ask for appointment of counsel. If the circuit court would have granted one of those, she, her case would have continued past that January 1st deadline with undoubtedly, she would have benefited from this 2025 amendment. And finally, just very briefly, I just have one final point of this corporate allow. I know my five minutes is, um, so the state is trying to say that, uh, the finality, right? With this new sentencing scheme is out the window, right? If we look at, this is discussing the Senate and, uh, the United States Supreme court has found no problems with these sentencing, uh, reform relief. It discussed, uh, a Trump Supreme court case in 2018, right? Uh, United States v Hughes. And that was about, uh, president Trump's, his first term, his first step and people who entered fully negotiated pleas in the federal setting, right? For a specific sentence could still benefit from this civil, uh, sentencing form scheme. It did not violate any contract principles. Um, even the most recent, uh, Supreme court case addressing that I heard arguments, Hunter v United States, the oral arguments happened after our briefs were filed. Justice, um, uh, Justice, I believe it was or Gorsuch justice Gorsuch doubted that such waivers that the state's claiming to waive all future claims that not in existence from a plea deal is even constitutionally permissible. Um, so in brief, uh, to wrap up, there's no more questions from, uh, any of the justices. Um, just as Clark. Yeah, I have a question. Um, it would seem to me that the, uh, comment of a legislator saying we're, we're doing this to address the situation wells is a separate question of whether something is retroactive. And could you point to any statutory language that clearly States it's intended to be retroactive? Uh, I cannot point to any specific language that should be retroactive, but to clarify, um, yes, there is the retrofit, uh, retroactivity, right. Which is how we're arguing that this case was still pending and, you know, moving forward from this January 1st state, all cases still pending that applies to it. But the legislative history that would be for the clarification doctrine, right. Those were two independent kind of approaches to this. So, so I know you, you continue to say that the case was still pending. Uh, if the amendments took effect in January of 25 and the dismissal of this was in November, December of 24, how was it still pending? Uh, just clarify that for me, if you would. Yes, because, uh, so pending on direct review, right. Uh, and the direct review here is the civil proceedings here. It's not the direct criminal one, right. This is amendment for the civil proceedings. And that one was still pending in this court and even a Hunter discussed, right. That it doesn't typical, uh, Supreme court precedent does not distinguish, right. Cases pending in the trial court and cases pending on appeal. The most important overriding aspect, if whether there's feasible ongoing proceedings for with just new procedural rule would apply on remand. And that is exactly the case here. The new, the further proceedings would be the PRJ proceedings that this new procedural rule would apply to. Okay. You want to wrap up? Uh, I think we're at that point, unless there are any other questions from Justice Vaughn or Justice Clark. No, no other questions. Thank you. Okay. In that case, briefly, I apologize. I didn't move you guys back on the schedule as we talked about before this argument, but I think I'll take the blame for that. We asked this court to reverse the dismissal order remain for further 2, 14 proceedings. Thank you. Okay. Thank you both for your arguments here today. And your briefs will take the matter into consideration as you're ruling in due course.